## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| IN RE: | § | |
| CYNTHIA SYDNEY SMITH | § | CASE NO. 18-80585 |
| | § | |
| Debtor | § | Chapter 7 |

_____

| | | |
|---|---|---|
| KEVIN ROBSON and | § | |
| CATHERINE ROBSON | § | |
| | § | |
| Plaintiffs, | § | ADVERSARY PROCEEDING |
| | § | NO. |
| v. | § | |
| | § | |
| CYNTHIA SYDNEY SMITH, | § | |
| | § | |
| Defendant, | § | |

### <u>COMPLAINT FOR DETERMINATION THAT DEBT IS NONDISCHARGEABLE</u>

COME NOW Plaintiffs, Kevin Robson and Catherine Robson, and for their Complaint against Defendant-Debtor Cynthia Sydney Smith ("Debtor"), respectfully alleges:

### <u>JURISDICTION</u>

1.      Plaintiffs are creditors of Debtor.

2.      As of the date of this Complaint, Debtor has not been granted a discharge.

3.      This Complaint is timely because the date by which a Complaint objecting to the Debtor's discharge or to determine dischargeability of a debt expires on September 17, 2018.

4.      This is an adversary proceeding in which Plaintiffs are seeking a determination as to the dischargeability of the debt owed by the Debtor to Plaintiffs under Bankruptcy Code §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).

**ADVERSARY COMPLAINT** **Page 1**

5.     This court has jurisdiction under 11 U.S.C. § 523 and 28 U.S.C. § 1334. This adversary proceeding relates to this case under Chapter 7 of the Bankruptcy Code, now pending in this court.

6.     This case is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and 157(b)(2)(J). The Court has jurisdiction over the non-core claim in this Complaint at least pursuant to 28 U.S.C. § 157(c)(1).

## PARTIES

7.     Plaintiff Kevin Robson is an individual residing in Tennessee.

8.     Plaintiff Catherine Robson is an individual residing in Washington.

9.     Defendant is the Debtor in the above-captioned case.

## FACTS

**A.    Introduction**

10.    After tricking Kevin Robson and Catherine Robson (collectively, "the Robsons") into investing in her startup gambling and substance abuse treatment center, Rise Center for Recovery, LLC ("Rise"), Smith burned through roughly $175,000 of the Robsons' funds in less than nine months, ignoring agreements with the Robsons and freely using company funds to finance her extravagant lifestyle.  From mid-February 2016 to mid-October 2016, Smith spent at least: (a) $8,921 on flights; (b) $987 on hotels; (c) $4,504 on rental cars or Lyfts; (d) $1,037 on airport parking; (e) $981 on restaurants and bars; and (f) and $9,244 on furniture.  She charged all of these personal expenses to Rise. Smith also wrote at least $33,205 worth of checks from the Rise account to unidentified parties, directed nearly $50,000 of company funds (through cash withdrawals and wire transfers) to herself, and made numerous personal purchases using Rise funds. Smith even deceived the Robsons into paying the $50,000 down payment on her home, and

then conned them into paying her personal living expenses, such as her house note (over $2,800 per month), cell phone bill, Lexus car note ($682 per month), car insurance, and even her trips to the salon.

**B.     Mr. Robson meets and gets to know Smith in Las Vegas**

11.     For the past 22 years, Kevin Robson has worked in various roles, including many leadership roles, in medical sales and medical sales consulting for some of the world's largest pharmaceutical companies.

12.     In September 2015, Mr. Robson attended an industry trade show in Las Vegas, Nevada.  At that time, he was the VP of Sales for a laboratory services company.  One night during the trade show, Mr. Robson had dinner with the CEO of an outpatient addiction treatment center for teenagers based in Las Vegas.  Smith, the clinical director of the addiction treatment center, was also in attendance.

13.     The following day, Smith, a Las Vegas resident, attended the trade show with Mr. Robson, and continued to do so throughout the remainder of the week.  She also went on morning runs with Mr. Robson and other trade show guests.  Throughout their time together, Smith told Mr. Robson of her plans to start a gambling and substance abuse treatment facility and asked for his help.  Smith initially told Mr. Robson she only needed his assistance in getting her in touch with contacts in the industry to help her get the business started.  Robson was kind enough to oblige, and offered his help.

**C.     Smith pitches the Robsons on her startup idea using material misrepresentations**

14.     Roughly one month later, after Mr. Robson had returned to Tennessee, Smith contacted him about the gambling and substance abuse treatment center she wished to open. During the call and on multiple other occasions, in exchange for capital funding, Smith promised

**ADVERSARY COMPLAINT**                                                                    **Page 3**

Mr. Robson she would devote 100 percent of her time and effort to the startup, would not take on or continue to engage in any responsibilities, tasks, or other duties that would interfere with her commitment to the startup, would be responsible for the day-to-day operation of the treatment facility, and would be onsite at the facility on a full-time basis. Unbeknownst to Mr. Robson, however, Smith made these representations to induce Mr. Robson—who had full authority to act on behalf of Mrs. Robson and who Smith knew would repeat the representations to Mrs. Robson— to invest Mrs. Robson's capital in the new business.

15. After meeting with industry consultants, the two decided Smith's original plan to open a residential treatment center (*i.e.*, a rehab center) was not a viable startup option. As such, it was decided an outpatient treatment facility would be the initial business model, with the hope to grow into a residential treatment center.

16. Smith, a native of Tahlequah, Oklahoma, suggested the outpatient gambling and substance abuse treatment center be located there. Mr. Robson, a Tennessee resident, had never heard of Tahlequah. As such, he asked why Smith recommended Tahlequah.

17. Smith told Mr. Robson the treatment center should be located in Tahlequah for a number of reasons. She represented she had many connections in the area, especially with Native American tribes (she identified herself as Cherokee), which she claimed would be invaluable to the financial stability of the startup. She also represented her contacts would make finding staff nearly effortless and that there was a large, untapped market for gambling and substance abuse patients in the Tahlequah area. Smith further represented she would reside in Tahlequah, and in furtherance of that, told Mr. Robson she had given the tenants in her rental house in Tahlequah notice to vacate so she could live there beginning in January 2016.

18.    Mr. Robson conveyed each of Smith's representations surrounding the treatment facility and investment offer to his mother, Mrs. Robson.  Based on Smith's representations, Mrs. Robson agreed to become a member of the startup and to provide capital funding.

19.    The Robsons would later find out Smith's representations were false and she knew they were false (or at least made them with reckless disregard for the truth) at the time.  In fact, Smith admitted in late September 2016 she knew a large population in Tahlequah did not have health insurance and did not want addiction treatment, finding staff would be difficult in such a remote area, and that she never intended to live in Tahlequah or devote all of her time to Rise.

**D.    Smith tricks Mrs. Robson into paying the down payment on her home after they form Rise**

20.    In early January 2016, Mrs. Robson and Smith, as the sole members, formed a member-managed Oklahoma limited liability company named Rise.  Around this time, Smith entered into a lease agreement for office space for Rise in Tahlequah.

21.    Also during this timeframe, Smith found a house in Las Vegas she claimed would be a great place to eventually start a residential treatment center.  She represented to Mr. Robson that if he or his mother would provide the $25,000 down payment for the home, she would seek to lease it to gain an additional revenue stream for Rise until Rise had the client base and need to begin a residential treatment center in Las Vegas. Smith specifically represented the home was ultimately to be used as Rise's residential treatment center. She also represented she would pay back the $25,000 loan. At the time Smith made these representations she had no intention of using the home as Rise's residential treatment center, she had no intention of paying back the $25,000 loan, and she intended for the Robsons to rely upon her misrepresentations.

22.    On February 1, 2016, Smith signed Rise's operating agreement, which purports to provide her with 95% membership interest.  Mrs. Robson signed the operating agreement, which

**ADVERSARY COMPLAINT**                                                                 **Page 5**

purports to be effective February 1, 2016 and lists Rise's principal office in Tahlequah, on March 6, 2016.

23.     In mid-February 2016, Smith asked the Robsons for another $25,000 for use in connection with the purchase of the Las Vegas home, which she again promised one day would be used for Rise's residential treatment center. At the time the she made this representation she knew it was false, and she intended for the Robsons to rely on it.

**E.    Mrs. Robson is fraudulently induced into an agreement with Smith, who uses Mrs. Robson's investment as her personal piggy bank**

24.     Based on Smith's numerous misrepresentations, which were all directly made to Mr. Robson and indirectly made to Mrs. Robson through Mr. Robson for the purpose of inducing the Robsons to loan her money, Mrs. Robson provided Smith $125,000 ($75,000 for startup capital and $50,000 for the down payment on the house in Las Vegas) in exchange for a 5% interest in Rise, among other things, which was memorialized in a secured promissory note dated April 1, 2016.

25.     Smith, using $50,000 provided to her by Mrs. Robson under the promissory note as a down payment, closed on the Las Vegas home in late February 2016.  She purchased the home for roughly $450,000.  But rather than attempt to lease the home to tenants, Smith moved into it. Making matters worse, she did not pay rent, losing Rise and the Robsons over $2,800 per month. She would later use Rise's business account to pay her house note.

26.     But that was the beginning of Smith's scam. Over the course of the next several months, Smith used the investment into Rise from Mrs. Robson as her own personal piggy bank. Smith did not live in Tahlequah as she originally represented to the Robsons.  Instead, she spent at most one week per month in Tahlequah.  Unbeknownst to the Robsons, Smith continued to attend Pacifica Graduate Institute, which is a few miles from Santa Barbara, California, at least

Case 18-08016   Doc 1   Filed 09/17/18   Entered 09/17/18 16:50:09   Desc Main
Document      Page 6 of 21

one week per month.  This was time Smith was not spending in connection with her commitment

to Rise in Oklahoma.  Making matters worse, Smith used Mrs. Robsons' investment in Rise for

travel expenses to and from California at least once per month.

27.     She also traveled to and stayed in Las Vegas at least one week per month, usually

more.  Unbeknownst to the Robsons, Smith continued to work with the Desert Research Institute

in Las Vegas at least one week per month.  Smith used the Las Vegas home purchased using Mrs.

Robson's capital investment in Rise as her own personal residence, again not paying anything to

Rise or the Robsons.  Smith used Rise's bank account for all travel expenses to and from Las

Vegas.  Smith also traveled extensively to other US cities, purportedly attending trade shows.  She

charged these expenses to Rise's bank account.

28.     Rather than spend 100 percent of her time in Tahlequah with Rise, Smith spent *at

most* one week per month in Tahlequah.  In fact, she was absent so often it caused staff to quit.

Smith did not devote any time or attention to Rise and was not spending Mrs. Robson's $125,000

investment on Rise.  Instead, she was using it to fund her extravagant lifestyle.

29.     By mid-May 2016, Smith had already spent the $125,000 capital investment

provided to her by Mrs. Robson under the promissory note just a few months earlier.  Rise received

$0 in revenue during this timeframe.  Smith, on the other hand, was living in an over 3,000 square

foot house paid for by Mrs. Robson.  She had directed over $18,000 from Rise's bank account to

herself, spent approximately $1,000 on hotels, roughly $3,000 on flights, over $1,500 on rental

cars and transportation, around $400 on restaurants and bars, nearly $6,000 on furniture, and wrote

$4,550 in checks to unidentified parties.[1]  Again, all in just a few months. Smith even withdrew

---

[1] On information and belief, Smith wrote at least some of the unidentified checks directly or
indirectly to herself.

**ADVERSARY COMPLAINT**                                                                 **Page 7**

$107 from Rise's checking account after she triggered a $100 overdraft protection deposit from Rise's savings account caused be her overspending—*i.e.*, she bled the account dry.

**F.    The Robsons bailout Smith who fails to return the funds as agreed**

30.    In late May 2016, Smith asked for more money to run Rise. Mrs. Robson entered into a secured promissory note agreement with Smith around that time and provided Smith with an additional $10,000, which was deposited into Rise's bank account.  Under the agreement, the principal and interest was due November 1, 2016.  Smith has failed to pay the note.

31.    Smith immediately proceeded to blow through the additional capital investment provided by Mrs. Robson.  Smith continued to charge all of her travel expenses and bar tabs to Rise's account, and continued to spend little time in Tahlequah and even less time promoting Rise.  She even began making large cash withdrawals and executing wire transfers to herself.

32.    In early June 2016, Smith again asked for a bailout for Rise.  Mr. Robson entered into a secured promissory note with Smith for an additional $5,000, which he deposited into Rise's bank account.  Under the agreement, the principal and interest was due October 1, 2016.  Smith has failed to pay the note as agreed.  In fact, within less than ten days, Smith had already spent the $5,000 bailout plus over $4,000 in additional funds from Rise's checking account.  She was again spending Rise money to fund her personal travel and dining.  She was also continuing to withdraw large amounts of cash from Rise's checking account.

33.    Mr. Robson entered into another secured promissory note with Smith in late June 2016 for yet another $5,000, which he deposited into Rise's account.  Under the agreement, the principal and interest became due October 31, 2016.  To date, Smith has failed to pay the note.  She wired herself $3,500 the day after Mr. Robson deposited the $5,000 bailout and continued to spend Rise monies on her extravagant lifestyle.

**ADVERSARY COMPLAINT**                                                                                          **Page 8**

34.     On or around June 30, 2016, Mr. Robson entered into his third promissory note with Smith, this one for $10,000, which was deposited into Rise's checking account. Under the agreement, the principal and interest became due December 31, 2016. Smith failed to pay the note.

35.     On or around August 30, 2016, Mrs. Robson entered into her second security promissory note with Smith for $10,000. Under the agreement, the principal and interest became due January 1, 2017. To date, Smith failed to pay the note.

36.     On information and belief, Smith never intended to repay any loans made to her under the above-described promissory notes.

**G.     Smith continued to frivolously spend company funds and even uses Mr. Robson's personal credit card number to pay her college tuition**

37.     Throughout September and October 2016, Smith, who still spent less than a week per month in Tahlequah, continued to use Rise funds to pay for her living expenses and lifestyle. She periodically withdrew cash in large increments, she continued to pay for personal travel, and she began to spend company funds on her car note (a new Lexus), personal clothing, and trips to the salon.  Smith even paid her over $2,800 house note from Rise's account—that is, she paid for the house she agreed to lease to a third party with Rise funds.

38.     In mid-September, Mr. Robson directly paid a medical billing company $3,220 as a loan to Smith so the third-billing company would take Rise's account off of hold, given Rise could not profit unless it could bill its few clients.  Smith has not paid back the loan.

39.     In October 2016, Smith stole money from Mr. Robson—she fraudulently used his credit card information to pay her college tuition.  In or around January 2016, at Smith's request, Mr. Robson provided Smith his personal American Express credit card information for use in connection with a Rise purchase.  She kept the information for over nine months, then, without

**ADVERSARY COMPLAINT**                                                              **Page 9**

Mr. Robson's knowledge or authority, on October 7, 2016 Smith used Mr. Robson's credit card information to pay her graduate school program $5,680.94. Smith's actions constitute a crime.

**H.     Smith is operating a competing business using Rise property**

40.     In breach of her duties to Mrs. Robson and Rise, Smith is operating a separate business ("Competing Business") under the RISE CENTER FOR RECOVERY and RISE trademarks (the "Marks"). The Marks are inherently distinctive and owned by Rise, and Smith does not have Rise's consent to use the Marks in connection with a separate and competing business.

41.     On information and belief, Smith also is misappropriating other Rise property, including confidential business and/or trade secret information, in connection with the Competing Business. Such Rise property includes, but is not limited to, charge master, intake forms, patient information, billing practices, and advertising and marketing practices.

42.     Smith has effectively abandoned Rise, and all business she is conducting through the Competing Entity, including all revenues generated through it, belong to Rise.

**I.     Smith has forfeited the right to manage any business or affairs of Rise**

43.     Smith and Mrs. Robson executed an operating agreement for Rise made effective February 1, 2016 ("Operating Agreement").

44.     Pursuant to the Operating Agreement, Smith and Mrs. Robson are the only members of Rise, and Smith was designated a member having a majority of the membership interest. Smith also was designed as manager of Rise, and was delegated the power and authority to manage and operate Rise and make decisions affecting its business and affairs.

45.     Through her repeated breaches of fiduciary duties to Rise, Smith has forfeited the right to make any decisions on behalf of Rise.

Case 18-08016    Doc 1    Filed 09/17/18    Entered 09/17/18 16:50:09    Desc Main
Document        Page 10 of 21

46.     Absent court intervention, Mrs. Robson cannot compel Rise to bring claims against Smith for breaching her fiduciary duties to Rise because Mrs. Robson is not a manager of Rise and only has a minority interest.

**J.      Debtor's Fraudulent, Willful and Malicious Conduct, and Securing of Services Using False Pretenses, a False Representation, or Actual Fraud**

47.     As set forth in this Complaint, Debtor has engaged in fraudulent, willful, and malicious misconduct, obtained money and property from Plaintiffs using false pretenses, a false representation, or actual fraud, engaged in fraud or defalcation while acting in a fiduciary capacity or embezzlement, and for willful and malicious injury by the Debtor to another entity or to the property of another entity.

48.     Debtor's bankruptcy filing was made in bad faith for the purpose of abusing the system.

## CLAIMS

**Count 1: Conversion / Civil Theft (Mr. Robson)**

49.     The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

50.     Without Mr. Robson's knowledge or consent, Smith charged $5,680.94 to Mr. Robson's personal American Express credit card.  Her actions were willful and with malice.

51.     Due to Smith's wrongful exertion of dominion, control, and authority over Mr. Robson's money and credit card, Mr. Robson suffered damages, including actual damages.

**Count 2: Common Law and Statutory Fraud (the Robsons)**

52.     The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

**ADVERSARY COMPLAINT**                                                                   **Page 11**

53.     Smith made at least the following false or misleading representations, which are detailed further in the paragraphs above:

      a.     She would devote 100 percent of her time and effort to Rise;

      b.     She would not take on or continue to engage in any responsibilities that would interfere with her commitment to Rise;

      c.     She would be onsite at Rise on a regular basis;

      d.     She would run Rise's day-to-day operations;

      e.     She would reside in Tahlequah;

      f.     Rise should be located in Tahlequah because she would live there, knew many people in the addiction treatment industry in Tahlequah, staffing would be easy, and there is a large, untapped market for gambling and substance abuse patients in Tahlequah;

      g.     She would use the Las Vegas home for Rise's residential treatment center, and in the meantime, would lease the property to a third-party tenant; and

      h.     She would spend Mrs. Robson's investment on strictly business expenses.

54.     Smith also failed to disclose the following material information to the Robsons, which is detailed further in the paragraphs above:

      i.     She planned to continue pursuing her degree at Pacifica Graduate Institute;

      j.     She planned to continue her work for the Desert Research Institute;

      k.     She did not hold licensures in Nevada;

      l.     She intended to fund her extensive travel and personal lifestyle with Rise funds; and

      m.     Many residents in the Tahlequah area do not have health insurance and do not want addiction treatment.

55.     Smith's representations were material and false, and she had a duty to disclose the material omissions of which she had actual knowledge.

56.     Smith made the misrepresentations knowing they were false or at least made them recklessly without knowledge of the truth.

57.     Smith knew Mr. Robson would (and intended him to) convey her representations to Mrs. Robson.  She also knew Mr. Robson had the authority to act on Mrs. Robson's behalf.

58.     Smith intended to deceive the Robsons.  She intended them to rely on her material misrepresentations and omissions.

59.     The Robsons justifiably relied on Smith's misrepresentations and omissions.  Based on them, Mrs. Robson entered into the operating agreement and three promissory notes with Smith, and Mr. Robson entered into three promissory notes with Smith and devoted his time and money to Rise.

60.     Smith committed these acts with malice.

61.     The Robsons sustained damages as a result.

62.     The Robsons seek actual damages, punitive damages, pre- and post-judgment interest, and court costs in connection with their claims for fraud.

**Count 3: Breach of Secured Promissory Notes (the Robsons)**

63.     The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

64.     Mr. Robson entered into a valid agreement with Smith whereby he agreed to pay Smith $5,000 in exchange for her payment of the principal with 2% interest by October 1, 2016. Mr. Robson performed under the agreement.  Smith, however, has failed to make any payment to Mr. Robson under the note.  She is in breach of the agreement.

65. Mr. Robson has suffered damages, including actual damages, attorneys' fees, court costs, and interest as a result of Smith's breach.

66. Mr. Robson entered into a valid agreement with Smith whereby he agreed to pay Smith $5,000 in exchange for her payment of the principal with 2% interest by October 31, 2016. Mr. Robson performed under the agreement. Smith, however, has failed to make any payment to Mr. Robson under the note. She is in breach of the agreement.

67. Mr. Robson has suffered damages, including actual damages, attorneys' fees, court costs, and interest as a result of Smith's breach.

68. Mrs. Robson entered into a valid agreement with Smith whereby she agreed to pay Smith $10,000 in exchange for Smith's payment of the principal with 2% interest by November 1, 2016. Mrs. Robson performed under the agreement. Smith, however, has failed to make any payment to Mrs. Robson under the note. She is in breach of the agreement.

69. Smith committed these acts with malice.

70. Mrs. Robson has suffered damages, including actual damages, attorneys' fees, court costs, and interest as a result of Smith's breach.

**Count 4: Breach of Fiduciary Duties (Mrs. Robson)**

71. The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

72. Mrs. Robson is a member and manager of Rise and is in a fiduciary relationship with Smith, who is also a member and manager of Rise.

73. As a manager of Rise, Smith owed Mrs. Robson the duty to discharge her duties as a manager in good faith, with the care of an ordinary prudent person in a like position under similar circumstances, and in a manner Smith reasonably believed to be in the best interest of Rise.

Case 18-08016   Doc 1   Filed 09/17/18   Entered 09/17/18 16:50:09   Desc Main
Document      Page 14 of 21

74.     Smith breached her fiduciary duties owed to Mrs. Robson by committing at least the following acts and omissions detailed further in the paragraphs above not in good faith and/or intentionally:

        a.       Freely spending Rise funds on personal and living expenses;

        b.       Withdrawing large amounts of cash for personal use;

        c.       Devoting at most one week per month of her time to Rise, and instead traveling extensively in connection with other obligations then charging those travel expenses to Rise;

        d.       Living in the Las Vegas house purchased with Rise capital under the false pretense it would be leased to third parties and eventually used in connection with a rehab center;

        e.       Not holding the proper licensures in Nevada;

        f.       Hiring additional employees, knowing Rise could not afford them;

        g.       Operating the Competing Business;

        h.       Using Rise property to operate a competitive business; and

        i.       Using the Marks in connection with a competitive business.

75.     Smith committed these acts with malice.

76.     As a result of Smith's breach of fiduciary duties, Mrs. Robson has been damaged.

77.     Mrs. Robson seeks actual damages, profit disgorgement, benefit disgorgement, punitive damages, court costs, pre- and post-judgment interest in connection with her breach of fiduciary duties claim.

**Count 5: Breach of Fiduciary Duties (Mrs. Robson derivatively on behalf of Rise)**

78.     The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

79.     As a member and manager of Rise, Smith owes to Rise the duty to discharge her duties as a manager in good faith, with the care of an ordinary prudent person in a like position under similar circumstances, and in a manner Smith reasonably believed to be in the best interest of Rise.

80.     Smith breached her fiduciary duties owed to Rise by committing at least the following acts and omissions detailed further in the paragraphs above not in good faith and/or intentionally:

       a.     Freely spending Rise funds on personal and living expenses;

       b.     Withdrawing large amounts of cash for personal use;

       c.     Devoting at most one week per month of her time to Rise, and instead traveling extensively in connection with other obligations then charging those travel expenses to Rise;

       d.     Living in the Las Vegas house purchased with Rise capital under the false pretense it would be leased to third parties and eventually used in connection with a rehab center;

       e.     Not holding the proper licensures in Nevada;

       f.     Hiring additional employees, knowing Rise could not afford them;

       g.     Operating the Competing Business;

       h.     Using Rise property to operate a competitive business; and

       i.     Using the Marks in connection with a competitive business.

81.     Smith committed these acts with malice.

82.     As a result of Smith's breach of fiduciary duties, Rise has been damaged and is being irreparably harmed.

**ADVERSARY COMPLAINT**                                                                 **Page 16**

83.     Derivatively and on behalf of Rise, Mrs. Robson seeks actual damages, profit disgorgement, punitive damages, court costs, pre- and post-judgment interest in connection with this breach of fiduciary duties claim.

## Count 6: Lanham Act Unfair Competition (Mrs. Robson derivatively on behalf of Rise)

84.     The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

85.     This claim arises under the Lanham Act, 15 U.S.C. § 1051, et seq.

86.     Smith's use of the Marks in connection with the Competing Business is likely to cause confusion as to the affiliation, connection or association between Rise and the Competing Business.

87.     Smith's use of the Marks is causing and will continue to cause irreparable harm to Rise unless she is preliminarily and permanently enjoined by this Court.

88.     Smith's unfair competition was willful and fraudulent, and maliciously intended to harm Rise.

89.     Derivatively and on behalf of Rise, Mrs. Robson seeks actual damages, profit disgorgement, punitive damages, court costs, pre- and post-judgment interest in connection with this Lanham Act unfair competition claim.

## Count 7: Common Law Unfair Competition (Mrs. Robson derivatively on behalf of Rise)

90.     The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

91.     By engaging in the misconduct described in this Complaint, Smith has engaged in unfair competition under the common law.

92. Rise has suffered, and will continue to suffer, irreparable harm which has no adequate remedy at law and which will continue unless Smith's misconduct is preliminarily and permanently enjoined.

93. Smith's unfair competition was willful and fraudulent, and maliciously intended to harm Rise.

94. Derivatively and on behalf of Rise, Mrs. Robson seeks actual damages, profit disgorgement, punitive damages, court costs, pre- and post-judgment interest in connection with this common law unfair competition claim.

## Count 8: Non-Dischargeability of Plaintiff's Claims Under Section 523(a)(2)(A) of the Bankruptcy Code

95. The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

96. Bankruptcy Code § 523(a)(2)(A) provides, in relevant part, that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

* * *

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

(A) false pretenses, a false representation or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

97. All or part of the debt owed to Plaintiffs is non-dischargeable as it is a debt for money, property, services, or an extension, renewal, or refinancing of credit, that was obtained by false pretenses, a false representation, or actual fraud within the meaning of Bankruptcy Code §§ 523(a)(2)(A).

**ADVERSARY COMPLAINT** **Page 18**

**Count 9: Non-Dischargeability of Plaintiff's Claims Under Section 523(a)(4) of the Bankruptcy Code**

98.     The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

99.     Bankruptcy Code § 523(a)(4) provides, in relevant part, that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

* * *

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

100.     All or part of the debt owed to Plaintiffs, as evidenced is non-dischargeable as it is a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny within the meaning of Bankruptcy Code § 523(a)(4).

**Count 10: Non-Dischargeability of Plaintiff's Claims Under Section 523(a)(6) of the Bankruptcy Code**

101.     The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

102.     Bankruptcy Code § 523(a)(6) provides, in relevant part, that:

(b) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt—

* * *

(6) or willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

103.     All or part of the debt owed to Plaintiffs is non-dischargeable as it is a debt for willful and malicious injury caused by the Debtor within the meaning of Bankruptcy Code § 523(a)(6).

**Count 11: Bad Faith Bankruptcy Filing**

104.    The Robsons incorporate by reference the allegations contained in the preceding paragraphs.

105.    Debtor filed her bankruptcy petition in bad faith.

106.    For example, Debtor's bankruptcy petition was filed the day before a hearing in *Kevin Robson and Catherine Robson v. Cynthia Sydney Smith*, Case No. 6:16-cv-00512-SPS, United States District Court for the Eastern District of Oklahoma, at which Debtor knew the Court might sanction Debtor in excess of $46,666 for her repeated litigation misconduct. Debtor's bankruptcy filing was made for the purpose of avoiding that sanction and delaying the Eastern District Court of Oklahoma litigation.

107.    Furthermore, despite that Debtor knew she was obligated to repay the promissory notes with Mrs. Robson, she failed to identify those promissory notes, or any other debts to the Robsons, in her bankruptcy filing. She did so for the purpose of

108.    Moreover, the same law firm that filed Debtor's bankruptcy petition is the same law firm that represented her in the litigation, and Debtor and her lawyers both knew that the Robsons should have been listed as creditors in her bankruptcy filing.

109.    For the foregoing reasons, among others, the Robsons object to consideration of Debtor's bankruptcy petition on the basis that she filed for bankruptcy protection for the purposes of abusing the system, delaying creditors, and otherwise taking advantage of the bankruptcy system, and that she has misrepresented and omitted information from her bankruptcy filings.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment against Debtor for conversion/civil theft, common law and statutory fraud, breach of secured promissory

Case 18-08016   Doc 1   Filed 09/17/18   Entered 09/17/18 16:50:09   Desc Main
Document        Page 20 of 21

notes, breaches of fiduciary duties, Lanham Act unfair competition, and common law unfair competition, and order Debtor to further pay all of the damages suffered by the Robsons, disgorge to the Robsons all revenues of her Competing Business under the Lanham Act, and pay pre-judgment interest and attorneys' fees connected with the same. Plaintiffs further respectfully request a Judgment determining that Debtor's debt to Plaintiffs is non-dischargeable under Bankruptcy Code §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6), and granting plaintiff such other and further relief as this Court may deem just and proper.

Dated:  September 17, 2018                    Respectfully submitted,

                                              **BRENNAN & WILSON**

                                              */s/ Alex Wilson*
                                              Alex Wilson, OBA No. 31433
                                              P.O. Box 1067
                                              Muskogee, Oklahoma 74402-1067
                                              Telephone: (918) 687-4400
                                              Facsimile: (918) 687-4430
                                              Email:  awilson@muskogeelawyers.com

                                              **COUNSEL FOR PLAINTIFFS**