**Dated: March 27, 2020**

**The following is ORDERED:**



_____
TOM R. CORNISH
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

IN RE:
CYNTHIA SYDNEY SMITH,                        Case No. 18-80585-TRC
                                             Chapter 7
                    Debtor.

KEVIN ROBSON and
CATHERINE ROBSON,

             Plaintiffs,

v.                                           Adv. No. 18-8016-TRC

CYNTHIA SYDNEY SMITH,

             Defendant.

## <u>OPINION</u>

This dispute arose over a failed business known as RISE, which offered gambling

addiction counseling and was operated by Defendant Cynthia Sydney Smith. Plaintiffs Kevin

Robson and Catherine Robson invested in that business. The Robsons sued Smith in U.S.

District Court in the Eastern District of Oklahoma. Smith filed bankruptcy and the Robsons filed

this adversary case seeking to except Smith's debts from discharge pursuant to 11 U.S.C.

§§ 523(a)(2)(A), (4) and (6). Having carefully reviewed the record, exhibits and testimony of the parties, the Court has concluded that the Robsons have not met their burden of proof; therefore, the Court finds in favor of Defendant Smith.

**I.**    **Jurisdiction**

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) and may hear and determine this case pursuant to 28 U.S.C. § 157(b)(2)(I) and (c). Venue is proper pursuant to 28 U.S.C. § 1408.

**II.**    **Findings of Fact**

**A.**    **Stipulations of Fact in the Pretrial Order**

1. RISE Oklahoma was a business created to provide gambling addiction services.

2. When RISE Oklahoma was formed, Smith was the only member.

3. The Robsons invested in RISE Oklahoma.

4. On June 26, 2016, Kevin Robson and Smith entered into a promissory note whereby Kevin Robson agreed to pay Smith $5,000 in exchange for her payment of the $5,000 with 2% interest by October 1, 2016.

5. Kevin Robson performed his obligations under the June 26 Promissory Note.

6. Smith failed to make any payments to Kevin Robson under the June 26 Promissory Note.

7. Smith is in breach of the June 26 Promissory Note.

8. On June 30, 2016, Kevin Robson and Smith entered into a promissory note for $10,000, which was deposited into RISE's checking account.

9. The June 30, 2016 promissory note became due on December 31, 2016.

10. Smith failed to pay any amounts on the June 30, 2016 promissory note.

**B.      Additional Findings of Fact**

The Court heard from two witnesses, Defendant Cynthia Sydney Smith[1] and Plaintiff Kevin Robson ("Robson"). Plaintiff Catherine Robson did not attend the trial. She is Kevin Robson's mother. Smith and Catherine Robson have never met nor spoken.

Smith and Robson met in the fall of 2015 in Las Vegas, Nevada. At that time, Smith was living in Las Vegas and working for Vencer Youth Services to set up an addiction treatment center for adolescents. Robson lived in Tennessee and worked for Gulfstream Diagnostics, a company that provided laboratory testing services, including drug testing. Robson wanted to procure a contract on behalf of Gulfstream with Vencer to provide laboratory testing services. A Vencer investor asked Smith to attend a dinner meeting with Kevin Robson. They attended several business events together, then began seeing each other for lunch and runs in Las Vegas. Robson asked about Smith's plans for her life. Smith shared her dream of opening a treatment center exclusively for gambling addiction that included a residential option. Robson was very impressed with Smith because of her "big vision" and passion for treating gambling addiction. Robson asked why she always worked for others rather than herself and what prevented her from starting her own business. She replied that she did not have the money needed to do so. Robson wanted to help her realize her dream and they began developing a plan for Smith to open a treatment center. They developed a "close friendship." When Robson visited Las Vegas, he stayed at Smith's home.

Although Smith was living in Las Vegas at the time they met, she had grown up in Oklahoma, and had property and family there. Robson encouraged Smith to open a gambling

---

[1] Ms. Smith preferred her middle name "Sydney" and used that name in most of her communications submitted as exhibits in this case, as well as the Operating Agreement.

treatment center in Oklahoma first, and then expand. Smith objected to this plan since she spent more time in Nevada, but they agreed to begin in Oklahoma.

Smith had no experience as the owner of a business. Robson described himself as an experienced business owner and entrepreneur. He had been a part owner of a pain clinic and wanted to own his own business. Robson provided names of people who could advise Smith regarding ownership and operation of a treatment center. At Robson's insistence, Smith traveled to Mesquite, Texas to consult with the owner of a treatment center. Smith and Robson had discussions regarding start-up costs for a treatment center, including office expenses, employee costs, computer systems and billing services. She estimated start-up costs to be between $75,000 to $200,000, and that it would take a year before the business would be able to support itself. By December of 2015, Robson verbally agreed to invest in and loan money to Smith to start a gambling addiction treatment business to treat clients in Oklahoma and Nevada. Although the amount of his investment was uncertain, Smith believed that he agreed to invest $125,000. Robson did not ask Smith to provide financial statements, tax returns, or similar information regarding her financial status, nor did she ever do so. He believed she had a good plan for the business and felt comfortable loaning funds to her without requiring any security. He and his mother believed in Smith's vision.

In January of 2016, while their discussions regarding start-up costs continued, Smith or Robson paid Legal Zoom, an online legal service, to prepare and file the appropriate legal documents to incorporate RISE Center for Recovery, LLC in Oklahoma. Smith was identified as the sole member of RISE in its initial operating agreement. Shortly thereafter, the parties amended the operating agreement to add Catherine Robson as a 5% member of RISE LLC, with Smith owning the remaining 95%. Smith was designated as the managing member of the LLC

and was given "the complete power and authority to manage and operate the Company and make all decisions affecting its decisions and affairs." Catherine Robson was identified as the company's budgeting and marketing manager but there was no evidence that she ever performed those functions. Instead, Kevin Robson functioned in that role. Smith identified Robson as the Chief Financial Officer ("CFO") of RISE, although he later denied to Smith that he ever held this title. Robson kept track of all expenses, input financial information and receipts into QuickBooks, provided financial information to RISE accountants, assisted in the purchase of office equipment, development of a company logo and website, development of business contacts, billing processes, and numerous other activities. The Operating Agreement specified that net profits or losses would be determined on an annual basis and allocated in proportion to each member's interest in the company. Funds could be distributed from net cash of the company. Smith and Kevin Robson agreed that Smith would be paid $6,000 a month as salary, less than what she was earning at the time. She left her job with Vencer to launch RISE Center for Recovery. Robson wrote Smith that he anticipated providing funding of $75,000 for RISE for its first four to five months of operations.

Smith and Robson opened a Bank of America bank account in the name "RISE CENTER FOR RECOVERY LLC." She and Robson were the only signatories to the account. Statements included Smith's address in Stilwell, Oklahoma. Robson deposited $5,000 into this account. Three days later, the Robsons deposited $70,000 into this account. Additional deposits were made by the Robsons of $10,000 on May 19, 2016, $5,000 on June 9, 2016, $5,000 on June 20, 2015, $9,300 on June 30, 2016, and $10,000 on August 30, 2016. These deposits, totaling $114,300, were characterized as loans from the Robsons, as evidenced by six promissory notes made by Rise Center for Recovery, with Sydney Smith as personal guarantor, totaling $165,000:

(1) note for $125,000 to Catherine Robson dated April 1, 2016; (2) note for $10,000 to Kevin Robson dated June 26, 2016; (3) note for $5,000 to Kevin Robson dated June 26, 2016; (4) note for $5,000 to Kevin Robson dated June 26, 2016; (5) note for $10,000 to Catherine Robson dated June 13, 2016; and (6) an undated note for $10,000 to Kevin Robson. Repayment of these notes was to be made in installments of 5% of the monthly profit after payment of all expenses and salaries generated by RISE Center for Recovery from the previous month, with payment due the 15th of the month following the first profitable month, and with varying deadlines for repayment in full. The governing law for the promissory notes was that of Oklahoma. The personal guaranty portion of the notes provided that those were entered into pursuant to the laws of Oklahoma and Nevada and would be governed by the laws of those states. Smith and Robson projected that the business may not become profitable until at least a year after it began operations. Neither Smith nor RISE made any payments on these notes. Smith testified that RISE's Oklahoma operations never became profitable.

RISE entered a two-year lease for office space in Tahlequah, Oklahoma in January of 2016. By April or May of 2016, RISE began receiving insurance payments for its clients. Approximately 95% of its revenues were from insurance, the remaining 5% from clients paying directly. In the fall of 2016, it received funds from the Oklahoma Council on Problem Gambling to pay for clients without insurance or other funds. RISE used a billing company to bill and process payments from insurance companies. Robson was unhappy with the original billing firm and insisted that RISE change to Statim, a Texas company with which he'd previously worked. Robson hired an IT person from Dallas, Texas to install computer equipment, using $5,000 from RISE funds. He also hired a marketing firm and paid it $5,000 out of RISE funds. Smith objected to these expenditures. Robson insisted that Smith purchase a used Lexus 350

automobile to use as a RISE company car. At Robson's request, the car was titled in Smith's name rather than his because he was in the midst of a divorce. Payments were made on this vehicle out of the RISE bank account with Robson's knowledge. Both he and Smith had keys to this vehicle.

Prior to Smith meeting Robson, she tried to purchase a home in Las Vegas, known as "the Torino house." In early 2016, she entered a contract to purchase the home for $469,000. She lacked sufficient funds to make the down payment required to avoid a jumbo mortgage loan with a higher interest rate than a non-jumbo mortgage loan. Robson offered to provide her with funds for the down payment and closing costs to keep her mortgage out of jumbo status. Smith believed that these funds were a gift from Robson. He transferred $25,000 to Smith to use for a partial down payment. Robson intended to transfer funds from the RISE bank account to cover the down payment and closing costs, but the mortgage company required funds to come from a personal bank account. Robson transferred $25,000 from the RISE account to his mother's bank account and then transferred funds from his mother's account to the mortgage company. Pursuant to emailed instructions from the mortgage company, Robson and his mother each signed a letter to the mortgage company stating that they were the source of the down payment of $50,000 and that the funds were a gift to Smith. The letters, both dated 2/22/16, stated: "I/We do hereby certify to the following: I/We (Donor) have made a gift of $50,000 dollars to the Borrower(s) named below, and no repayment of this gift is expected or implied either in the form of cash or future services of the recipient." Kevin Robson identified himself as Smith's uncle in the gift letter. Robson maintained that neither he nor his mother intended to give Smith $50,000 but that they willingly signed the gift letters stating otherwise in order to facilitate Smith's purchase of the Torino house. Robson stated that the Promissory Note for $125,000 between

Smith and his mother dated April 1, 2016 included the $50,000 down payment from him and his mother. Smith's mother co-signed the mortgage with Smith. The purchase was completed, and Smith and her mother became the owners of the Torino house in March of 2016.

Smith and Robson disagreed regarding the purpose of buying the Torino house and whether it was to be used as a residential treatment center for RISE's Las Vegas operations. The house was zoned residential and would need extensive renovations to be used as an inpatient treatment facility. Smith did not believe it was practical to modify the house and get zoning approval to use it for RISE and insisted that Robson always knew that the house was not suitable for that purpose. However, based on the parties' email correspondence it appears that some consideration was given to using the Torino home for RISE and for inpatient services prior to or around the time of Smith's purchase of the house. Smith emailed Kevin Robson that "[t]he buzz is in the air about RISE Residential gambling center in vegas. I think the torino house is perfect to start out in!!" She also emailed Robson that she couldn't "wait to see what transpires when the residential is up and running." It isn't clear from these emails just what Smith's intent was regarding the Torino house. Several months later, Robson emailed Smith and acknowledged that Smith was uncertain about whether to use the Torino house as a residential treatment center when considering the purchase, suggesting that Smith had considered that option but decided not to pursue it.

Robson made many trips to Las Vegas and stayed at the Torino house during his visits. He had a key to the house. Dr. Reid, who provided medical services to RISE, also stayed in the Torino house when he traveled to Las Vegas. Robson told Smith that Robson's company would pay rent for his stays at the Torino house since Robson was attempting to develop clients in Las Vegas for that company. Eventually, Smith's mother moved into the Torino house and,

according to Smith, invested approximately $45,000 to make improvements to the house. In July or August of 2019, Smith transferred her interest in the Torino house to her mother. Smith no longer has any ownership interest in the house, although she is still liable on the mortgage. Her mother makes the mortgage payments.

In June or July of 2016, RISE added operations in Las Vegas, Nevada. The parties did not present corporate documents regarding the Nevada operation, but Smith operated both entities. Robson was aware that RISE had clients and operations in both locations. The parties' emails and texts indicate that they anticipated operating RISE in both Nevada and Oklahoma from the beginning of their collaboration. Some funds from the RISE Bank of America account were used to purchase furniture and equipment for the Las Vegas office. RISE leased office space on Cougar Street in Las Vegas. Smith traveled between Oklahoma and Nevada trying to establish and operate RISE in both locations. Robson suggested that monies for both locations be run through the RISE Bank of America account and it appears that this occurred. Bank of America statements for RISE include deposits from Las Vegas entities. However, the parties did not explain whether the deposits were generated from Oklahoma clients or Las Vegas clients. Smith eventually opened a separate bank account at Armstrong Bank, Tahlequah, Oklahoma for RISE Center, using her Torino house address.

Almost from the beginning of its operations, RISE struggled to pay its bills. In the summer of 2016, it had a negative balance in its bank account. Robson urged Smith not to worry about making payments on the notes. By the end of September 2016, RISE was running out of funds. It did not have enough patients to fund operations. Robson refused to provide additional funds to keep RISE in operation. Smith became very angry with him. She accused him of inappropriately touching her, which he denied. They exchanged heated text messages and

emails.  Smith believed that Robson had instructed the billing firm Statim to stop work for RISE, and that Robson's contact at Statim was providing Robson with copies of correspondence between Smith and Statim without Smith's knowledge.  However, RISE was not current on its payments to Statim.  RISE received no revenue from Oklahoma operations for four months.  It ceased its business operations in Oklahoma in January of 2017.

Smith was enrolled in a graduate program at Pacifica Graduate Institute in Carpinteria, California during the time she was launching RISE.  Robson gave her his American Express card to be used to pay tuition for the Fall of 2016, as well as for RISE expenses.  Robson stated that the tuition could be considered a continuing education business expense.  In Robson's presence while they were at the Torino house, Smith tried to pay her tuition with his credit card.  The charge was unsuccessful.  Shortly after Robson and Smith's relationship ended, Smith again attempted to charge her tuition on Robson's American Express card.  When he learned of the charge, he contacted American Express and disputed it.  The charge was reversed.  Robson denied ever promising to pay Smith's tuition but admitted that he gave her his credit card number to be used for other charges.  As a result of the disputed tuition charge, Smith was denied enrollment at Pacifica and was required to petition for re-enrollment.

After their falling out, Smith attempted to close the RISE Bank of America account.  She was unable to do so without Kevin Robson's consent.  Smith then opened the account for RISE CENTER at Armstrong Bank in Oklahoma in October of 2016, using the Torino house address.  Smith obtained a federal employee identification number for RISE Nevada.  Smith contacted Statim to redirect billings for RISE Oklahoma to RISE Nevada.  She sought the assistance of Statim to audit its billings on behalf of RISE Oklahoma.  It is unclear how much, if any, revenue from RISE Oklahoma were received and deposited into the Armstrong Bank account.  The bank

statements from the Armstrong Bank account do not reveal whether deposits were from services rendered in Oklahoma or Nevada, and there was no specific testimony on this subject. RISE Nevada did its own billing for patient services. Smith had a friend redesign a new RISE trademark or logo and website. She did not use the logo created by the company Robson had hired. Smith did not draw a salary from RISE Nevada until the Spring of 2017. At that time, her monthly salary was $8,000. Office equipment and furniture that had been purchased in the summer of 2016 with funds from the RISE Bank of America account continued to be used in the Nevada office. In the summer of 2017, RISE's Nevada office moved from Cougar Street to a new location and continued to use some of the same office equipment and furniture. Smith never sought the Robsons' permission to use the RISE name, office furniture or equipment after October of 2016. RISE discontinued its Nevada operations sometime in 2019. Smith continues to treat private clients in Oklahoma and Nevada and works with casinos to develop programs encouraging responsible gambling.

Kevin Robson and his mother Catherine Robson sued Smith in U.S. District Court for the Eastern District of Oklahoma in November of 2016, alleging conversion/civil theft, fraud, negligent misrepresentation, breach of contract, breach of fiduciary duties, Lanham Act violations for unfair competition, common law unfair competition, and sought a declaratory judgment. Therein, the parties participated in two settlement conferences and were involved in a discovery dispute that had been set for hearing. Smith filed chapter 7 bankruptcy on May 31, 2018, identifying her debt as primarily business rather than consumer debt. On September 17, 2018, the Robsons filed this adversary case.

## III.    Conclusions of Law

The Robsons allege the same causes of action here as set forth in their federal court case:

conversion and civil theft, common law and statutory fraud, breach of contract, breach of fiduciary duties, and Lanham Act and common law claims for unfair competition. They allege actual damages of $283,528.01, with $850,548.03 in treble damages for Lanham Act violations, as well as punitive damages, attorney fees and costs. To prevail, they must establish that they have a valid claim against Smith, and that her debt falls within the exceptions to discharge identified in 11 U.S.C. §§ 523(a)(2), (4) and (6). Smith has stipulated that they have a valid claim against her for at least $15,000, and she also acknowledged that the Robsons invested $125,000 into RISE for which they received no repayment.

Smith seeks a declaratory judgment finding that the $50,000 paid for the down payment on the Torino house was a gift from the Robsons, that Kevin Robson tortiously interfered with her relationship with Pacifica Graduate Institute, and seeks punitive damages against Kevin Robson for intentional and malicious actions.

### A. Exceptions to Discharge.

Actions seeking nondischargeability of a debt stand or fall on the provisions of § 523 of the Bankruptcy Code. The underlying debt is established by other law, either state or federal law, while the issue of nondischargeability is a matter of federal law governed by the Bankruptcy Code. *See Grogan v. Garner,* 498 U.S 279 (1991). Thus, whether Smith's debts may arise pursuant to the Lanham Act, breach of contract, conversion, etc., they must be evaluated under the appropriate exceptions to discharge in § 523.

Exceptions to discharge are to be narrowly construed with doubt being resolved in the debtor's favor. *Affordable Bail Bonds, Inc. v. Sandoval (In re Sandoval),* 541 F.3d 997, 1001 (10th Cir. 2008) (citing *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar),* 125 F.3d 1358, 1361 (10th Cir.1997)). It is only those debts which arise from a debtor's unacceptable

misconduct, such as dishonesty, fraud, or intentional injury that are excepted from discharge under § 523. Creditors seeking to prevent discharge as to their claims have the burden of proving each element of their claim by a preponderance of the evidence. *Pino v. Jensen (In re Jensen),* 2019 WL 2403105, at *4 (10th Cir. BAP June 7, 2019).

### 1.      11 U.S.C. § 523(a)(2)(A): False Pretenses and False Representations

To except Smith's debt from discharge under § 523(a)(2)(A), the Robsons must prove that Smith obtained money, property, services or extension of credit based on false pretenses, false representation or actual fraud other than a statement regarding debtor's financial condition. Each of these exceptions – false pretenses, false representations or actual fraud − depend upon the debtor's intent to deceive the creditor. Recognizing that the debtor will rarely admit to fraudulent knowledge or intent, "the bankruptcy court must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates intent to deceive the creditor'." *Guinn v. Anderson (In re Anderson),* 403 B.R. 871, 877 (Bankr. D. Kan. 2009) (citation omitted). *See also Copper v. Lemke (In re Lemke),* 423 B.R. 917, 922 (10th Cir. BAP 2010) ("Intent to deceive may be inferred from the totality of circumstances.")

The elements of a § 523(a)(2)(A) claim for false pretenses or false representations are: 1) the debtor made a false representation; 2) the debtor made the representation with the intent to deceive the creditor; 3) the creditor relied on the debtor's representation; 4) the creditor's reliance was justifiable; and 5) the creditor was damaged as a proximate result. *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996) (citations omitted). False representations are express misrepresentations, while false pretenses are implied misrepresentations intended to create and foster a false impression. *Bank of Cordell v. Sturgeon (In re Sturgeon),* 496 B.R. 215, 223 (10th Cir. BAP 2013).

The Robsons allege that Smith misrepresented that the Torino house would be used as a residential inpatient treatment center for RISE, thus inducing them to loan funds to her for the purchase of the home. They failed to prove this by a preponderance of the evidence. At best, the evidence was inconclusive.

Smith denied making this representation and stated that both she and Kevin Robson knew at the time of the purchase that the house was zoned residential and needed a great deal of modification before it could be used as a residential treatment facility. Kevin Robson did not dispute this testimony. Her testimony, coupled with Robson's email stating "When you bought the house you went back and forth on whether to turn that into a residential home" leads this Court to believe that at the time of the purchase he was at the very least aware that no definitive decision had been made regarding the house's purpose and that it was certainly possible that the Torino house would not be used by RISE for a residential treatment center. Therefore, the Court concludes that Smith did not make a false representation regarding the purpose of the Torino house with an intent to deceive the Robsons.

The Court also concludes that Kevin Robson had other reasons for giving Smith funds to purchase the Torino home. He indicated an intention to help Smith buy the house and provide funds so that she would not need to take out a jumbo mortgage. Kevin Robson made use of the house for his own personal benefit and for his business during frequent trips to Las Vegas and used it as office space. He made the decision to give or loan funds for the house with full knowledge of what he was doing, and with the intent to help Smith to buy the house regardless of how the house was used.

The Robsons failed to identify any other false representations made with an intent to deceive by Smith regarding additional funds invested in RISE. The evidence established that

both Kevin Robson and Smith desired to start RISE and worked to make it a successful business. There was no evidence that Smith misrepresented her abilities or qualifications to start and run a business dedicated to treating gambling addiction. Smith acknowledged that she did not make any payments on the promissory notes although she intended to do so, but a failure to fulfill her contractual obligations on the notes does not establish misrepresentation for purposes of § 523(a)(2)(A) without additional evidence. Based on the totality of circumstances, the Court concludes that the Robsons did not establish their claim to except Smith's debt from discharge based upon false pretenses or false representations by a preponderance of the evidence.

### 2. 11 U.S.C. § 523(a)(2)(A): Actual Fraud

The United States Supreme Court has defined actual fraud:

> "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky Int'l Elects., Inc. v. Ritz,* 136 S. Ct. 1581, 1586 (2016) (quoting *Neal v. Clark,* 95 U.S. 704, 709 (1878)). Actual fraud requires proof of fraudulent intent, a fraudulent scheme, and injury caused by the scheme. *Cherry v. Neuschafer (In re Neuschafer),* 2014 WL 2611258, at *5 (10th Cir. BAP June 12, 2014.)

The Court finds Smith's testimony to be credible and largely undisputed and finds no actual fraud. The Court finds no intent to defraud nor any scheme to defraud. There was no evidence that Smith developed a scheme by which she set out to defraud the Robsons. Smith certainly did not reject Kevin Robson' offers of financial assistance or to establish and operate RISE, but that does not establish a scheme to defraud him or his mother. By his own admission, it was Kevin Robson who initiated the discussion about Smith's dreams and challenged her to

embark on the path to establish her own gambling addiction counseling company including inpatient services. He was deeply involved in creating and launching RISE, and he volunteered to invest monies into a new company. In fact, it appeared to the Court that, as an entrepreneur with monies just sitting around doing nothing (as he put it), it was Kevin Robson who had the intent and plan to start the new business. The evidence showed that both Robson and Smith invested much time as well as money to establish RISE in Oklahoma and Nevada, to promote it and to obtain clients, with the hope and intent that RISE would become successful in its mission to treat gambling addiction, as well as to provide a good return on their investment. The Court heard no evidence that leads it to believe that Smith set out on a fraudulent scheme to bilk Kevin Robson or his mother of their money, or that she engaged in any deception or trickery. In fact, he stated that he did not just rely upon Smith's plan for RISE, but also relied upon an assessment obtained from Mike Webb, a consultant in the industry, before deciding to invest. He also testified that he consulted with an attorney about securing repayment before providing funds for the down payment of the Torino house. Robson stated that he was comfortable investing in RISE and providing funds to purchase the Torino house based upon a good business plan, his own experience as an entrepreneur, and an industry consultant's opinion.

Any injuries suffered by the Robsons from investing in RISE were the result of the failure of the business and failure to obtain any security for their investments, not a fraudulent scheme. There was no evidence that Smith acted with the mental state required to prove fraud at common law, moral turpitude or intentional wrongdoing. *See Husky,* 136 S. Ct. at 1586. Her testimony that Kevin Robson approached her about starting the business, obtained the legal forms to set up the LLC, and offered to provide funds to operate was uncontroverted.

As the Court has previously discussed, the evidence did not establish that Smith

fraudulently induced the Robsons to provide the funds to purchase the Torino house by tricking them into believing that the home's purpose was for an inpatient treatment center. Despite his insistence now that he never intended to give funds to Smith for the house, he and his mother signed gift letters, which were written statements provided to the mortgage company that the funds were gifts with no expectation of repayment. There is insufficient evidence to support the claim that the Robsons were fraudulently induced to sign these letters by Smith. Robson knew why the letters were needed, having communicated directly with the mortgage company to make sure he and his mother complied with its rules. His goal was to assist Smith in buying the house, help her keep the loan amount below jumbo status, he made no demands regarding Smith's use of the house, nor did she make any promises. Therefore, the Court finds that the Robsons failed to establish by a preponderance of the evidence that Smith obtained monies from them by actual fraud.

### 3. 11 U.S.C. § 523(a)(4): Fraud or Defalcation by Fiduciary; Embezzlement

This exception prevents an individual debtor from discharging any debt for fraud or defalcation while acting in a fiduciary capacity, or when incurred by embezzlement or larceny. The Robsons argue that Smith's debt should be excepted under either theory. They allege that Smith owed a fiduciary duty to them, but if not, she embezzled funds, furniture, computers and the RISE trademark from RISE Oklahoma. Therefore, the Court must examine both exceptions covered in § 523(a)(4): fraud or defalcation by a fiduciary and embezzlement.[2]

#### a. Fraud or Defalcation by Fiduciary

To succeed in excepting a debt pursuant to this section, the Robsons must establish two things: 1) the existence of a fiduciary relationship between them and Smith, and 2) a defalcation

---

[2] The Robsons did not allege larceny.

committed by Smith in the course of that fiduciary relationship. *In re Young,* 91 F.3d at 1371. The existence of a fiduciary relationship is a threshold issue. The Tenth Circuit narrowly construes the phrase "fiduciary capacity" in § 523(a)(4). *Id.*; *Fletcher v. Deerman (In re Deerman),* 482 B.R. 344, 371 (Bankr. D. N.M. 2012). The requisite fiduciary relationship exists only where there is an express or technical trust, not a constructive trust or one implied by law or contract. *In re Young,* 91 F.3d at 1371. "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, . . . nor an inequality between the parties' knowledge or bargaining power . . . is sufficient to establish a fiduciary relationship for purposes of dischargeability." *Id.* at 1372 (citations omitted). Moreoever, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy and not as a result of the wrongdoing." *Id.*; *In re Deerman*, 482 B.R. at 371.

The Robsons allege that Smith owed Catherine Robson a fiduciary duty as the manager of RISE Center for Recovery LLC, citing the Operating Agreement as well as Oklahoma's Limited Liability Company Act, OKLA. STAT. tit. 18, § 2000 *et seq.* They also allege breach of fiduciary duty under Oklahoma common law. However, that general fiduciary duty is not what is contemplated under the Bankruptcy Code or the Tenth Circuit. A cause of action exists "only where the debtor is designated a trustee over particular money or property (the trust *res*) by virtue of an express or statutory trust, and the debt consists of the loss of money or property entrusted to the debtor." *Moses v. Duncan, (In re Duncan),* 2011 WL 6749054, *17 (Bankr. N.D. Okla. Dec. 22, 2011) (citations omitted). Any trust that may be said to arise under the Oklahoma Limited Liability Company Act is a trust *ex maleficio,* that is one arising from malfeasance, and after a debt is created and is therefore excluded from the scope of § 523(a)(4). *Id.* at *18. The Operating Agreement does not contain a provision establishing an express trust.

Since there is no express or technical trust between Smith and either of the Robsons or RISE, they failed to establish a claim under § 523(a)(4) for defalcation by a fiduciary. Furthermore, as *Duncan* discusses, even if there was a qualifying trust, the beneficiary would be the LLC, not a particular member. Thus, the Robsons claim of fraud or defalcation by a fiduciary under § 523(a)(4) fails as a matter of law.

### b. Embezzlement

Embezzlement requires proof of "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come, and it requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud." *Marks v. Hentges (In re Hentges),* 373 B.R. 709, 723 (Bankr. N.D. Okla. 2007) (citations omitted). The Robsons allege that Smith embezzled funds, furniture, computers, and the RISE trademark from RISE Oklahoma without authorization. They cite her attempt to close the RISE Bank of America bank account and attempt to divert funds from RISE Oklahoma operations to RISE Nevada as a fraudulent attempt to misappropriate funds from the Oklahoma LLC. They claim $283,528.01 in actual damages, which are the deposits made into the Armstrong Bank account from October of 2016 through April of 2018. They argue that this Court must presume that all RISE Nevada revenues, that is, deposits into the Armstrong account, stem "from the selling power of the RISE mark." As previously noted, the Robsons brought this case on their own behalf, and did not expressly name RISE as a party or state that Catherine Robson brought the action derivatively as a member of the LLC. As individuals, they could not assert a claim against Smith directly since the property they allege was misappropriated belonged to RISE, not to them personally. *See In re Deerman*, 482 B.R. at 375. However, the Court will review their claim as if it is a proper derivative claim on behalf of RISE. *See* OKLA. STAT. tit. 18, § 2000 *et*

*seq.*

The RISE operating agreement gave Smith "the complete power and authority to manage and operate" RISE Center for Recovery and "make all decisions affecting its business and affairs" without approval of Catherine Robson. As the majority member, she also had the authority to determine what bank accounts were established and how funds were deposited. Kevin Robson was an integral part of the RISE operation, both in Oklahoma and in Nevada. From its inception, RISE operated in two states, and used the Bank of America account. There was not a separate account for the Nevada office and billings until October of 2016. Furniture and office supplies for both locations were purchased out of the Bank of America account. Smith and Robson commingled receipts from both locations and treated them as a part of one operation. It is also clear from the evidence that Kevin Robson was deeply involved in all aspects of RISE and aware of the revenues and expenditures of the company. There was no evidence presented regarding the separate billings and revenues generated by location, nor was there any information regarding expenses by location. There was no evidence regarding the use of the logo, the similarity between the marks, or any confusion – either real or likely − between the RISE operations. There was no evidence regarding trade secrets or intellectual property that were owned by RISE or that Smith somehow misappropriated. Instead, the Court finds that RISE's patients and billings were derived primarily from Smith's contacts in the gambling addiction treatment industry. She had the education, training, expertise and contacts in that industry, and garnered patients on that basis.

The Court finds insufficient evidence of embezzlement. Smith's attempt to close the Oklahoma bank account did not rise to the level required for embezzlement. She testified that she had always wanted to set up a separate account for Las Vegas billings as a better means for

tracking billings and expenses.  She also preferred to concentrate her efforts and operations there, having had little success in generating sufficient patients and billings in Oklahoma.  She stated that she did not believe she needed special authority or approval from the Robsons to determine where deposits would be made because of the language of the Operating Agreement.  It is clear to the Court that Smith and the Robsons intended to operate RISE in both Nevada and Oklahoma.  Smith's concentration of operations in Nevada seemed designed to maximize revenues to save RISE, not an effort to cut out the Robsons.  Thus, the Court sees no evidence of moral turpitude or fraudulent appropriation of property by Smith.

Similarly, the Court does not find sufficient evidence of embezzlement in Smith's use of Kevin Robsons' credit card to pay her tuition.[3]  The evidence established that Kevin Robson did authorize Smith to use his credit card to purchase items for RISE and for her tuition.  Smith's second attempt to charge her tuition may have been misguided but it did not rise to the requisite level for embezzlement since it was based upon Robson's previous grant of permission.  And, as he admitted, he successfully disputed the charge and it was reversed, resulting in no harm to him.  Consequently, the Court finds the Robsons failed to establish a claim under § 523(a)(4) for embezzlement.

### 4.    11 U.S.C. § 523(a)(6):  Willful and Malicious Injury

To succeed in excepting a debt from discharge under § 523(a)(6), the Robsons must prove that Smith willfully and maliciously injured their property, i.e., that she deliberately and intentionally injured their property, not merely a deliberate or intentional act that led to injury.  The debtor must desire the consequences of her act or believe that the injurious consequences are

---

[3] The Robsons' cited § 523(a)(6) as the appropriate exception for use of the credit card but the Court considers it here as well.

substantially certain to result from the conduct and the conduct must be without just cause or excuse. *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). "The Tenth Circuit applies a subjective standard in determining whether a debtor desired to cause injury or believed the injury was substantially certain to occur." *Pino v. Jensen (In re Jensen),* 2019 WL 2403105, at *11 (10th Cir. BAP June 7, 2019) (citations omitted). This exception generally relates to torts as opposed to contracts or breaches of duty. *Id.* at *10. As with their claim under § 523(a)(4), the Robsons did not expressly bring this claim derivatively on behalf of RISE, except to mention it in a footnote in their posttrial brief, even though they allege injury from infringement of the RISE mark, embezzlement of RISE funds and property and diversion of RISE business. Kevin Robson also alleges injury due to the use of his credit card.

The Court finds no evidence to support a deliberate or intentional act by Smith designed to injure the Robsons or RISE. The evidence established that both Smith and Kevin Robson worked diligently to launch RISE and make it a success. The failure of RISE and loss of the Robsons' investment cannot be attributed to a willful and malicious injury or any deliberate and intentional act by Smith. There appeared to be a variety of reasons why the business was not successful as anticipated by both Smith and Kevin Robson. The evidence established that Smith worked to make RISE successful, and with the intention of repaying the Robsons' investment. After Kevin Robson refused to invest additional funds into RISE, Smith attempted to continue the business operations and generate revenues. The Court does not find those actions to be taken with a malicious intent to injure the Robsons, but with an intent to keep the business afloat.

The Court finds no conversion of property sufficient to except the debt from discharge. The continued use of property purchased with funds invested by the Robsons is not an act of conversion. "Conversion will not lie for a debt." *Collins v. Leonard (In re Leonard),* 2019 WL

1062484, *6, (Bankr. W.D. Okla. March 6, 2019) (quoting *In re Hentges,* 373 B.R. at 730).

Once they invested funds in RISE, those funds became RISE funds. RISE funds were used to

purchase furniture and equipment which became RISE's property, not the Robsons'. They had

no right to possess it personally. Robson and Smith obviously had a parting of the ways, and

there was a breakdown in their relationship, but the Court does not believe Smith's subsequent

actions were malicious and deliberately taken to injure the Robsons or RISE. Smith desired for

RISE to continue and be successful despite Kevin Robson's withdrawal from its operations and

choice not to invest more monies into the company. Her continuation of the business and use of

RISE property was necessary if RISE was to be able to repay the Robsons. Despite her efforts,

the operations in Las Vegas failed to generate sufficient income to sustain RISE, the business

failed, and she breached her promissory notes to the Robsons.

      The Court has previously discussed Smith's use of Kevin Robson's credit card to pay her

tuition. Because of his previous agreement to pay for the charge, she had a legitimate basis and

excuse for making that charge. And, even if he established an intentional act, he was able to

have the charge reversed and bore no financial injury. Therefore, the Court finds that the

Robsons failed to establish a claim by a preponderance of the evidence under § 523(a)(6).

      **B.**       **Non-Bankruptcy Claims**

      In evaluating the Robsons' claims under the Bankruptcy Code, the Court has considered

their claims for conversion, trademark infringement, breach of contract, breach of fiduciary duty

and fraud. In spite of the allegations made, the Court finds that the evidence failed to meet the

standard required to except their claims from discharge.

      **C.**       **Smith's Claims**

Smith sought a declaratory judgment that the Robsons' payment for the Torino house was a gift, rather than a loan. The Court has determined that regardless of the characterization, this amount should be discharged, thus a declaratory judgment as to that issue is unnecessary. The Court finds insufficient evidence to establish Smith's claim for tortious interference with business relations regarding her enrollment in graduate school. Indeed, the Court heard no specific testimony regarding this claim at trial. Therefore, the Court denies this claim against Kevin Robson.

Smith seeks an award of attorney fees and costs pursuant to 11 U.S.C. § 523(d). That section allows the award of attorney fees and costs if a creditor pursues an exception to discharge of a consumer debt, which is defined in § 101(8) as a debt incurred by an individual primarily for a personal, family or household purpose. Although the Court finds in Smith's favor and that the Robsons failed to sustain their burden of proof to except her debt from discharge under § 523(a)(2), there was some evidence to support their claim. Further, Smith's debt was not in the nature of a consumer debt since it was incurred to begin a business. Indeed, she characterized her debts as primarily business related, not consumer debt. The Court therefore declines to award Smith attorney fees and costs to defend this action.

## IV.     Conclusion

It bears repeating that exceptions to discharge must be narrowly construed with doubt being resolved in the debtor's favor, and that creditors who desire to except a debt from discharge have the burden of proving each element by a preponderance of the evidence. This case lacked sufficient evidence of fraud, false representations, fraud by fiduciary, embezzlement or willful and malicious injury. Smith offered credible testimony and evidence establishing that this was a case of a business that was unable to sustain itself and generate a return on the

Robsons' investment within the time frame desired by the Robsons, despite their best efforts and experience in business. For the above stated reasons, the Court finds that the Robsons have not sustained their burden of proving an exception to discharge for any debt owed to them by Smith pursuant to 11 U.S.C. § 523(a)(2)(A), (4) or (6). The Court shall enter a separate judgment in favor of the Defendant.

###